# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| v. | |
| **MIGUEL CASTRO-SANTIAGO,** | **Crim. No. 18-446 (ADC)** |
| **Defendant.** | |

## OPINION & ORDER[1]

Before the Court is defendant Miguel Castro-Santiago's ("defendant") motion to suppress. **ECF No. 22**. The government responded in opposition. **ECF No. 24**. The Court held an evidentiary hearing on the matter. **ECF No. 27**. For the following reasons, the motion to suppress is **DENIED**. **ECF No. 22**.

## I. Background

Defendant is charged with one count of being a prohibited person—a drug user—in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). **ECF No. 11**. Defendant was arrested at Vista Alegre Public Housing Project ("Vista Alegre") near Caguas, Puerto Rico, during an "enforcement operation" on July 5, 2018. **ECF Nos. 1-1; 22** at 1.

---

[1] This Opinion and Order is entered *Nunc Pro Tunc* for record completeness. Defendant plead guilty to an Information on January 27, 2020. *See* **Crim. No. 20-041-1 (ADC)**.

During the evidentiary hearing, the Court heard testimony from Puerto Rico Police Department ("PRPD") Agent Eduardo Sánchez-Ortíz ("Agent Sánchez"); PRPD Sergeant Berlitz David-Rodríguez ("Sergeant David"); and Alcohol, Tobacco, Firearms, and Explosives ("ATF") Task Force Officer Hector González-Rivera ("TFO González") about the circumstances surrounding defendant's arrest.

Agent Sánchez testified that his specialized unit targeted high crime areas in Caguas and had identified a known drug point in Vista Alegre. The unit had organized an intervention at that drug point for July 5, 2018. Approximately seven officers arrived in two unmarked cars around 1:05 p.m. Agent Sánchez and Sergeant David rode in the second car with two other officers. The second car parked near a horse stable while the first car continued driving. When the officers entered Vista Alegre, people in the area began running. Defendant was one of those individuals. Agent Sánchez and Sergeant David testified that they did not know what defendant was doing or where he was standing before their arrival. Agent Sánchez observed defendant run past him while carrying a black messenger bag. Agent Sánchez exited the vehicle after defendant ran past, identified himself as police, and ordered defendant to stop. Defendant proceeded to run faster, heading towards a horse stable located at the bottom of a hill. Agent Sánchez testified that he believed the bag contained narcotics and possibly weapons, noting later in his testimony that he has seen individuals use this style of bag to carry narcotics and firearms in other interventions. Sergeant David also testified that, in her professional experience, individuals use these bags to conceal firearms while they are outdoors.

Agent Sánchez pursued defendant, never losing sight of him. Sergeant David remained uphill. As the chase approached the hill by the stables, Agent Sánchez and Sergeant David observed defendant toss the bag while defendant continued running uphill in the direction of Sergeant David. The contents of the bag were not visible at that time. Agent Sánchez retrieved the discarded bag while defendant continued running towards Sergeant David who was approaching from the opposite direction. Upon grabbing the bag, Agent Sánchez felt that the bag contained a heavy object and concluding it was firearm he yelled "Gun!" to Sergeant David. Sergeant David indicated defendant was almost crawling his way up the hill towards her due to the slope. Upon hearing Agent Sánchez yell "Gun," she drew her firearm and ordered defendant to stay on the ground. Agent Sánchez then handcuffed defendant while Sergeant David advised him of his Miranda rights. Sergeant David testified that defendant did not request counsel at that time.

The agents conducted a pat-down of defendant and seized at least one cell phone.[2] The agents then transported defendant to the Office of the Caguas Intelligence Unit. Sergeant David testified that defendant did not request an attorney while officers transported him to the station. Once at the station, Agent Sánchez read a Miranda Rights form to defendant, in Spanish, line by line, that defendant initialed and signed, indicating that he did not wish to waive his rights. **ECF Nos. 1-1** at 2; **22-2**. Agent Sánchez testified that defendant did not want to talk. Agent Sánchez

---

[2] Officers seized two cell phones from defendant, but Agent Sánchez could not recall if they found one in the black bag or both on defendant's person.

and Sergeant David both testified that defendant did not request an attorney at that time. Once defendant indicated he did not wish to speak, officers did not interview him or challenge his decision to remain silent. Sergeant David testified that the only question officers asked defendant after that point was whether he would like some pizza.

Officers then proceeded to inventory defendant's property. Inside the black bag, agents found a small bag of a green, leafy substance; a plastic vial of a green, leafy substance; a bag of smoking wrapping papers; one 9 mm Glock pistol; two 9 mm Glock magazines; a waistband holster; fifty rounds of 9 mm ammunition; and one clear plastic bag containing a machinegun conversion kit for a Glock pistol. **ECF No. 1-1** at 1–2; **Govt Ex. 2, 2A**.

PRPD agents contacted the ATF. When the ATF agents arrived around 4:00 p.m., PRPD provided them with the background information of the case and the Miranda form defendant had earlier signed before bringing the ATF agents to defendant. Agent Sánchez and Sergeant David informed the ATF agents that defendant wanted to remain silent. Agent Sánchez testified that defendant had not requested an attorney at the time. TFO González testified that PRPD officers had not informed him that defendant requested counsel at any point. However, a report from ATF signed by its preparer, Special Agent Jorge Escribano ("Agent Escribano") on July 20, 2018, noted that defendant "requested legal representation" (the "ATF report"). **ECF No. 22-1**.

Around 4:45 p.m., the ATF agents met with defendant and repeated the Miranda warnings, at which time defendant voluntarily indicated he was willing to speak and signed a Miranda form indicating such. **Govt Ex. 3, 3A**. TFO González testified that it is very common

for suspects to choose not to talk to PRPD but to talk to ATF. He described defendant's demeanor during the interview as calm, friendly, and cooperative. Defendant told the ATF agents that he has been a regular marijuana user for the past seven years. Defendant also consented to a cell phone search and signed a corresponding consent form. *Id*. **Govt Ex. 4; ECF No. 1-1** at 2. TFO González testified that at no point while he was at the PRPD station in Caguas did he hear defendant request a lawyer or say that he wanted to stop talking. TFO González indicated that he had reviewed the audio recording of defendant's interview the week prior to the hearing to confirm that defendant did not request an attorney during their interview.

Defendant raises two challenges in his suppression motion. He argues that PRPD arrested him without cause and that PRPD and ATF violated his Miranda rights by reengaging with him after he repeatedly invoked his rights to counsel and to remain silent. **ECF No. 22** at 2.

## II. Legal Standard

The Fourth Amendment protects against unreasonable seizures, including seizure of the person. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). An arrest is "the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence." *Id*. "An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id*. at 626 (emphasis in original). This standard "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *Id*. *Cf. id.* at 624 ("'A ship still fleeing, even though under attack, would not be considered to have been seized as a war prize.'" (citing *The Josefa Segunda*, 10 Wheat. 312, 325–26 (1825)). To

effectuate a formal arrest, officers must have probable cause to believe that a crime has been committed. *United States v. Rasberry*, 882 F.3d 241, 246–47 (1st Cir. 2018), *cert. denied*, 2018 WL 3575762 (U.S. Dec. 3, 2018). It is also a prerequisite "for a de facto arrest." *Id*.

A person's presence in a known high-crime area, without more, is not enough to support a reasonable suspicion that a person is committing a crime. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979)). However, "nervous, evasive behavior," such as "unprovoked flight upon noticing the police," "is a pertinent factor in determining reasonable suspicion." *Id*. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id*. An evaluation of reasonable suspicion is a fact-sensitive inquiry that "must be performed in real-world terms." *United States v. Ruidíaz*, 529 F.3d 25, 29 (1st Cir. 2008). It is "a practical, commonsense determination—a determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers." *Id.* (citations omitted). "[N]o *direct* link between the suspect and the suspected criminal activity need be forged in order to achieve reasonable suspicion." *Id*.

"In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "[A]fter initially being advised of his *Miranda* rights,

[an] accused may himself validly waive his rights and respond to interrogation." *Id.* at 484 (citation omitted).

A suspect's "request for counsel must be clear and unambiguous." *United States v. Oquendo-Rivas*, 750 F.3d 12, 18 (1st Cir. 2014) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994). "Where a request, marred by ambiguity or equivocation, suggests only 'that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.'" *Id.* at 19 (quoting *Davis*, 512 U.S. at 459). Courts assess whether a suspect's request "be such that 'a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Id.* (quoting *Davis*, 512 U.S. at 459); *see Davis*, 512 U.S. at 459 (noting that "a suspect need not speak with the discrimination of an Oxford don" to adequately "articulate his desire to have counsel present" (citation and internal quotation marks omitted)). "Immediately after a suspect has invoked the right to counsel, all questioning must cease until such counsel is provided." *Oquendo-Rivas*, 750 F.3d at 18 (citing *Edwards*, 451 U.S. at 485).

In contrast, "an invocation of the right to remain silent does not automatically bar the resumption of questioning at a later time." *Id.* at 17. Courts apply a four-part test to determine "whether the resumption of questioning is permissible: (1) whether a reasonable period of time passed prior to the resumption, (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed *Miranda* warnings, and (4) whether questioning concerned the same alleged crime" ("*Mosley* factors"). *Id.* at 17–18 (citing *Michigan v. Mosley*, 423 U.S. 96, 104–06 (1975)) (additional citations omitted). A court also "must account for the totality of the

circumstances, with an eye to determining whether the suspect retained the ability to choose whether and when to speak." *Id*. at 18 (citation and internal quotation marks omitted).

### III. Analysis

#### A. Probable Cause for the Arrest

Defendant first argues that PRPD arrested him without probable cause. **ECF No. 22** at 3. According to defendant, PRPD arrived "en masse" at Vista Alegre, "jumped out of their unmarked vehicles," "yelled 'police,'" "followed several individuals" even though "[t]hey observed no demonstrably illegal activity," and "then ordered [defendant] to the ground at gunpoint," at which time they "conducted a full search of his person." *Id.* at 1, 3. Defendant also notes that the officers seized several "innocuous items such as a cell phone and car keys" during the pat down. *Id.* at 3. It is "this sequence of events," that defendants argues "undoubtedly amount[s] to a seizure" and "is tantamount to a de facto arrest," requiring probable cause. *Id*. Defendant's argument rests on the notion that "[t]here is nothing illegal about walking or even running away from the police." *Id.* at 4. Defendant asserts that "[t]his is especially true when the police themselves have provoked any movement that may occur." *Id.* Defendant claims that PRPD's presence at Vista Alegre to conduct an enforcement operation "was specifically designed to provoke and intimidate." *Id*. at 4–5. Accordingly, defendant asserts that suppression is warranted "of any and all statements and other evidence obtained." *Id*. at 5.

Defendant's description of the sequence of events omits many important details described in the criminal complaint and during the hearing. Sergeant David did not simply exit

the unmarked police vehicle and order defendant to the ground at gun point to conduct a pat down. Rather, a car containing four agents, including Agent Sánchez and Sergeant David, stopped at a known drug point. Before officers could even exit the vehicle, people in the area began running away, including defendant. Both PRPD agents testified that they observed defendant carrying a bag akin to bags they have seen used in previous interventions as vessels for drugs and guns. Agent Sánchez identified himself and shouted at defendant to stop, which prompted him to speed up. Agent Sánchez pursued defendant. Both he and Sergeant David observed defendant discard his bag. Agent Sánchez recovered the bag, felt a gun inside, and alerted his partner. Then, Sergeant David ordered defendant, at gun point, to get on the ground.

Defendant's argument turns on the assumption that the PRPD agents' pursuit of him constituted a "seizure." This argument is similar to the argument rejected by the Supreme Court in *California v. Hodari D.*, 499 U.S. 621 (1991). In that case, late one evening, two police officers "were on patrol in a high-crime area of Oakland, California," in "street clothes but wearing jackets with 'Police' embossed on both front and back," and driving in an unmarked car. *Id.* at 622. During their patrol, "they saw four or five youths huddled around a small red car parked at the curb. When the youths saw the officers' car approaching they apparently panicked, and took flight." *Id.* at 622–23. This raised the officers' suspicion and they decided to give chase. *Id.* at 623. One officer pursued defendant Hodari on foot. *Id.* The officer observed Hodari toss "what appeared to be a small rock." *Id.* The officer then "tackled Hodari, handcuffed him, and radioed for assistance." *Id.* The rock Hodari discarded was crack cocaine. *Id.*

The question presented to the Supreme Court was "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment," rendering the drugs "the fruit of that seizure." *Id*. at 623–24. If Hodari was not "seized" during the pursuit, he abandoned the drugs, rendering the drugs lawfully recovered by the police. *Id*. at 624. The Court assumed, for the purposes of argument, that the officer's "pursuit qualified as a 'show of authority' calling upon Hodari to halt," and held that a show of authority, without submission thereto, does not constitute a seizure. *Id*. at 625–26. The Court ruled that the Fourth Amendment standard for seizure of a person, requiring either physical force or submission to an officer's assertion of authority, "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee." *Id*. at 626. "Mere words will not constitute an arrest." *Id*. (citation and internal quotation marks omitted). Thus, the Court concluded that the officer's pursuit of Hodari did not constitute a seizure. *Id*.

The Supreme Court also noted the policy implication of Hodari's arguments, seeking "to stretch the Fourth Amendment beyond its words and beyond the meaning of arrest," noting that "[s]treet pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged." *Id*. at 627. The Court surmised that "[o]nly a few of those orders . . . will be without adequate basis," and "invariably . . . the responsible course [is] to comply"; "[u]nlawful orders will not be deterred . . . by sanctioning through the exclusionary rule those of them that are *not* obeyed." *Id*. (emphasis in original).

Here, under the *Hodari* framework, defendant was observed in a high-crime area, carrying a bag police associate with drugs and guns, engaging in "nervous, evasive behavior," i.e. "unprovoked flight upon noticing the police." *See Wardlow*, 528 U.S. at 124. These factors combined gave the officers reasonable suspicion to pursue defendant, as in the *Hodari* case and, upon discovery of the gun in the discarded bag, probable cause to arrest him. Defendant was not seized prior to Sergeant David's arrest, which occurred after Agent Sánchez discovered and alerted about the discarded gun.

## B. Miranda Rights

Defendant next argues that the authorities "trampl[ed]" his "specifically and unambiguously invoked" Constitutional rights to counsel and to remain silent. **ECF No. 22** at 5–8. He argues that he invoked his rights on PRPD's Miranda form, yet the ATF agents engaged in questioning. *Id*.

### 1. Right to Counsel

Defendant argues that he specifically and unequivocally requested counsel, pointing to the July 20, 2018 ATF report which states, "Castro-Santiago denied ownership of the black satchel bag and requested legal representation." **ECF No. 22-1**. He also notes that "[a] plethora of authority" supports his argument that he unequivocally and unambiguously invoked his right to counsel when he checked the box on the PRPD Miranda form indicating, "I understand the rights that those [Miranda] warnings bestow upon me and I decided **TO NOT waive** the same." **ECF Nos. 22** at 5; **22-2** at 2 (emphasis in original). He argues that any ambiguity the

officers may have perceived from his invocation of his rights via the Miranda form is attributed to ambiguities in their form, not in his invocation.

The government argues that defendant's invocation of his right to counsel was not clear or unequivocal. **ECF No. 24** at 6. The government notes that defendant did not submit an affidavit attesting to his requests for counsel. *Id*. Agent Sánchez, TFO González, and Sergeant David all testified that defendant never requested an attorney. And Sergeant David clarified that she understood defendant's response on the Miranda form as indicating simply that he did not wish to waive his rights. In contrast, defendant affirmatively exercised his right to remain silent with PRPD. But, the government argues, defendant's invocation of his right to remain silent does not also amount to an invocation of his right to counsel. *Id*. at 7.

The Court notes that the ATF report cited by defendant in his motion to suppress was not submitted into evidence at the hearing; it was prepared by Agent Escribano, who did not testify; and TFO González could not specifically recall reading the report. Defense counsel asked TFO González whether he adopted Agent Escribano's ATF report, to which the government objected. The Court sustained the objection. Defense counsel also asked Agent Sánchez whether he had told the ATF agents upon their arrival at the station that defendant had requested legal representation, which he answered in the negative and indicated that his memory was clear on this point. The defense elicited no further testimony or evidence to substantiate the accuracy of the ATF report. Thus, the report is not properly before the Court for consideration.

The Court rejects defendant's argument that by checking the box on the PRPD form, he clearly and unambiguously invoked his right to counsel. The PRPD form indicates that defendant chose not to waive his Miranda rights. Sergeant David testified as to having the same understanding. This does not amount to a clear and unambiguous statement requesting legal representation; indeed, it does not amount to a statement as to legal representation at all. It is simply a notation that defendant is not waiving any Miranda rights.

Defendant cites several cases holding that ambiguities in Miranda forms should be construed in favor of a suspect's affirmative request for counsel. **ECF No. 22** at 5–7. The form in this case, however, is not ambiguous. Thought it employs a double-negative structure, the unfortunate grammar does not render it ambiguous. And, the caselaw on which defendant relies is not binding on this Court. Thus, the evidence as to defendant's request for counsel amounts to the PRPD form indicating that he did not wish to waive his rights and Agent Sánchez, Sergeant David, TFO González's testimonies that defendant never requested counsel.

### 2. Right to Remain Silent

Defendant also argues that the ATF agents' interrogation after he invoked his right to remain silent violated the Fifth Amendment. **ECF No. 22** at 7–9. The government responds that, although defendant invoked his right to remain silent with PRPD, "he freely and voluntarily waived his rights to speak with ATF Agents." **ECF No. 24** at 10.

Because defendant never requested an attorney, ATF agents were not automatically forbidden from interviewing him simply because he had earlier expressed his right to remain to

silent to PRPD officers. *See United States v. Lugo Guerrero*, 524 F.3d 5, 11–12 (1st Cir. 2008). Under the four-part *Mosely* test cited above, courts consider: "(1) whether a reasonable period of time passed prior to the resumption [of questioning], (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed *Miranda* warnings, and (4) whether questioning concerned the same alleged crime." *Oquendo-Rivas*, 750 F.3d at 17–18 (citing *Mosley*, 423 U.S. at 104–06) (additional citations omitted).

Defendant invoked his right to remain silent with PRPD at 1:45 p.m. **ECF No. 22-2**. Three hours later, ATF agents met with defendant. They repeated to him the Miranda warnings and provided defendant with a form to confirm that he understood his rights. **ECF No. 24-2**. At 4:46 p.m., defendant initialed and signed the form, electing to waive his rights. *Id*. There is no evidence suggesting that defendant was not well-treated during the intervening three hours. Indeed, Sergeant David testified that meanwhile, PRPD officers offered defendant pizza. There is also no evidence that any of the officials aggressively questioned defendant or otherwise attempted to coerce his waiver. Thus, although the ATF interview concerned a similar crime, borne out of the same events, it is clear from the evidence that defendant was in control of the decision to provide a statement. *See Lugo Guerrero*, 524 F.3d at 12. Accordingly, defendant's statements to the ATF agents were not elicited in violation of his right to remain silent.

IV. **Conclusion**

Probable cause supported defendant's arrest, defendant never invoked his right to counsel, and officials did not violate defendant's right to remain silent.

Accordingly, defendant's motion to suppress is **DENIED. ECF No. 22**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 28th day of February, 2020.

                                                    **S/AIDA M. DELGADO-COLÓN**
                                                      **United States District Judge**